### COMMUNITY PROGRESS, INC.

v.

### Samuel MARTINEZ et al.

### Civ. No. N–76–231.

United States District Court,
D. Connecticut.

Sept. 3, 1976.

Stephen G. Friedler, Hilcoff, Kaplan & Friedler, New Haven, Conn., for plaintiff.

Peter Dorsey, U. S. Atty., New Haven, Conn., for defendants.

### MEMORANDUM OF DECISION

NEWMAN, District Judge.

This case is before the Court on cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56. No material facts are in dispute. The single question presented is one of statutory construction: whether a community action agency is eligible for federal funding under 42 U.S.C. § 2791(b)[1] if the "public sector" members of the agency's Board of Directors are neither elected public officials currently holding office, nor representatives of incumbent officials. The issue appears to be one of first impression.

The plaintiff, Community Progress, Inc. (CPI), is a non-stock, non-profit Connecticut corporation that has been designated as a community action agency.[2] As such, it is New Haven's anti-poverty agency, and has been receiving federal funds in order to support and administer a variety of anti-

---

1. 42 U.S.C. § 2791(b) states, "Each board to which this subsection applies shall . . . be so constituted that (1) one-third of the members of the board are elected public officials, or their representatives . . ." The section also requires that community action agencies have Boards of Directors composed of at least one-third representatives of the poor. The balance of the Board must be composed of representatives of business, industry, education, la-

bor, religious, and welfare groups in the community. Hereinafter the directors who are required to be elected public officials or their representatives will be referred to as the "public sector" directors.

2. 42 U.S.C. § 2781 et seq. describes the structure and functions of community action agencies.

poverty programs since 1962. Defendants, Samuel Martinez and Ivan Ashley, are the National and Regional Directors, respectively, of Community Services Administration (CSA). CSA is the federal agency authorized to provide financial assistance to community action agencies.[3]

This case arises from a dispute between CSA and CPI over whether the current composition of CPI's Board of Directors disqualifies CPI from receiving continued federal funding. On June 11, 1975, former Mayor Bartholomew Guida appointed six individuals to the 21-member CPI Board of Directors as the "public sector" representatives. On March 17, 1976, Mayor Frank Logue, who was elected to succeed former Mayor Guida in November, 1975, appointed six different individuals to the CPI Board as the "public sector" representatives.[4] CSA has taken the position that CPI's failure to seat the "Logue directors" on its Board, and the continued service of the "Guida directors," disqualifies CPI from receiving further federal anti-poverty grants.[5]

On June 25, 1976, Ivan Ashley, CSA Regional Director, held an administrative show cause hearing to allow CPI to demonstrate why its federal assistance should not be suspended for failure to comply with 42 U.S.C. § 2791(b).[6] Ashley did not find good cause for the alleged non-compliance, and informed CPI that its federal assistance would be suspended. CPI filed this suit on July 7, 1976, and obtained a temporary restraining order from United States District Judge Robert C. Zampano forbidding CSA from suspending CPI's funding. The temporary restraining order expired on July 27, 1976. Government counsel has informed the Court that CSA will continue CPI's funding through the present program year, ending August 31, 1976, but that no funding will be provided beyond that date unless CPI's "public sector" directors are *incumbent* elected officials or their representatives.

The natural meaning of the statute's text tends to support the view that the "public sector" members of a community action agency's Board of Directors must be elected officials currently holding public office, or their representatives. Section 2791(b) of Title 42 states, in pertinent part, that "Each board to which this subsection applies shall . . . be so constituted that (1) one-third of the members of the board are elected public officials, or their representatives." A community action agency has two alternative ways of complying with the statute. It can have a Board of Directors one-third of whom are elected public officials, or one-third of whom are the representatives of elected public officials.

In determining the issue in this case, two words of the statute are critical—"are" and "representatives." The statute requires community action agencies to have Boards of Directors composed of people who have a certain status. The description of that status is linked with the verb "are." Because the verb is in the present tense, the statute's command exerts a present, current force. No community action agency can be said to comply with this requirement unless

---

**3.** *See* 42 U.S.C. § 2808 *et seq.* Community Services Administration is the successor agency to the Office of Economic Opportunity. Pub.L. 93–644, § 9(a), Jan. 4, 1975, 88 Stat. 2310.

**4.** It is unclear which of these particular appointees have not been able to serve on the CPI Board. The Government's memorandum in support of its motion for summary judgment indicates that Mayor Logue has appointed two directors and acquiesced in one prior appointment by Mayor Guida. Therefore, it would appear that CPI's Board contains three directors who are representatives of the incumbent city administration. According to the Government's memorandum Mayor Logue has

appointed four other persons who have not been seated as directors for want of vacancy. The four positions they would occupy are presently filled by the remaining Guida appointees. Defendants' Memorandum in Support of Motion for Summary Judgment 2.

**5.** *See, e. g.,* Telegram from Ivan Ashley, CSA Regional Director, to Edward White, CPI Executive Director, June 29, 1976. Plaintiff's Exhibit B.

**6.** 45 C.F.R. § 1067.1–4 describes the process CSA must follow to suspend a community action agency's funding.

its Board of Directors includes one-third directors who *are* elected public officials or who *are* their representatives. Furthermore, a community action agency fails to meet the requirement if its Board of Directors ceases to include one-third elected public officials or their representatives. A legislative command cast in the present tense creates a continuing obligation.

Plaintiff CPI urges the Court to focus on the appointment, rather than the present status, of the directors. According to CPI, a community action agency complies with § 2791(b) if one-third of its directors *were,* at the time of their appointment, elected public officials or their representatives. That interpretation, however, is at odds with the statutory language.

The second critical word is "representatives." This is particularly important because New Haven has chosen to use representatives of elected public officials to comply with § 2791(b). The concept of representation is complex, but certainly the core meaning of the word is to stand in place of, or to act for.[7] The statute calls for directors who are elected public officials or "their representatives." Thus, representative "public sector" directors must stand in place of, or act for, the elected public officials they were selected to represent. Without the representative status conferred by the elected public official, they would have no standing to qualify as "public sector" directors. This is a relational concept, and the representative relationship does not exist when the person being represented ceases to have the status required by the statute. The "Guida directors" *were,* at the time of their appointment, representatives of elected public officials; they are not now. They were appointed to represent a

municipal administration that no longer governs.

An additional point that adds some support to this interpretation is the last sentence of § 2791(b), which places limits on the length of time an individual can serve as a community action agency director. These limits apply only to directors who are selected either to represent the poor, or to represent local business or community organizations. The absence of any limit on the length of service for "public sector" directors suggests that Congress intended "public sector" directors to have terms of service that would be coextensive with their status as elected public officials.

In addition to the text of 42 U.S.C. § 2791(b), its legislative history also supports a construction of the statute that requires "public sector" directors to be incumbent elected public officials or their representatives.

Section 2791(b) was added to the Economic Opportunity Act in 1967 as part of the so-called Green Amendment.[8] The House Committee on Education and Labor, of which Congresswoman Green was a member, conducted an extensive investigation of the Office of Economic Opportunity. After its investigation, the Committee characterized one shortcoming of the federal anti-poverty effort as the "most important" —the lack of participation by local public officials in the decision-making process of the community action agencies in their communities.[9] The Committee proposed what became § 2791(b) and several other amendments to the Economic Opportunity Act to rectify that problem.

Under the heading "Strengthening the Role of Public Officials," the House Report

---

7. *Webster's New International Dictionary* 2114 (2d ed. 1960).

8. P.L. 90–222, Dec. 23, 1967, 81 Stat. 672.

9. H.R.Rep.No.866, 90th Cong., 1st Sess. (1967), reprinted in 1967 U.S.Code Cong. & Admin. News 2428–2571:

Most importantly, though, in initial attempts to protect the legitimate interests of the poor in the conduct of community action programs, an unwholesome situation has arisen

in many communities where responsible public officials have not actively participated in the decision-making process with regard to community action programs in their communities. The committee regrets that this has happened, and the most important amendments to title II, we feel, will remedy that situation.

H.R.Rep.No.866 at 21; 1967 U.S.Code Cong. & Admin.News 2448.

on the Green Amendment indicates that the purpose of § 2791(b) was to increase the effectiveness of community action agencies by harmonizing the agencies' programs with local government activities. The Report states that the Committee's investigation found that:

. . . almost every community action agency which is doing a good job of creating new opportunities for the poor has the approval of, and a good working relationship with, the governing structures in its community . . .

. . . unless a community's governing structure endorses the community action agency, there is little hope that the agency will be able to realize its vital potential for planning and coordination. This will happen only if the community action agency is viewed as an instrument of the community which it serves and not as the vehicle for implementing federally established objectives.[10]

By *requiring* community action agencies to have Boards of Directors one-third of whom are elected public officials or their representatives, Congress sought to insure that federal anti-poverty grants would go to agencies that were in the best position to use the funds effectively—agencies that were working closely with local elected public officials. Unless "public sector" members are appointed by incumbent elected public officials, this purpose of the statute could easily be frustrated.

Plaintiff CPI urges that defendants' interpretation of the statute ought to be rejected because it would increase the risk that community action agencies might be used for partisan political purposes, which is directly contrary to Congress' intent. It may be true that by giving public officials some influence, if not control, over local community action agencies, Congress created some risk of excessive political influence. But Congress was well aware of that danger,[11] and chose to strike a balance between the costs and benefits of increased participation of public officials that heavily favors local government influence.[12]

Moreover, excerpts from the House of Representatives debate on the Green Amendment suggest that the participation of public officials was actually intended to safeguard the integrity of the community action program.

Rep. Green: The bill does provide that State or local governmental officials shall participate and for good reasons: Those who spend public money and initiate local projects affecting the entire community should and must be accountable to their fellow citizens through the democratic process, an election, and the electorate has the chance to reject those for whom private gain or personal power is of greater value than public service.

The bill does not blunt the attack on poverty through this provision. It helps to ensure that locally elected commanders will be responsible for local successes and local failures.[13]

\* \* \* \* \* \*

Rep. Waggoner: . . . Give the responsibility for community action agencies to responsible elected officials who have a responsibility to their electorates. Remove them from those who have no responsibility to anyone.[14]

\* \* \* \* \* \*

Rep. Green: I like to refer to this part of the bill as . . . the 'home rule' provisions. When we have elected governmental officials in an area, they are the ones who are responsible to the entire electorate. . . . As I said before, if

---

10. H.R.Rep.No.866 at 22; 1967 U.S.Code Cong. & Admin.News 2449.

11. Congressional awareness of the possibility of abuse is indicated in H.R.Rep. 866, 90th Cong., 1st Sess. 21, 23–24 (1967), reprinted in 1967 U.S.Code Cong. & Admin.News 2448, 2450. *See also* 42 U.S.C. § 2796.

12. In fact, 42 U.S.C. § 2791(a) allows states, or political subdivisions of states, to be designated as community action agencies and receive federal anti-poverty funds directly.

13. 113 Cong.Rec. 31416 (remarks of Rep. Green).

14. *Id.* at 32367 (remarks of Rep. Waggoner).

they are blind to the needs of the poor, and if they are deaf to any pleas for change, then the opportunity is available to all of the people in the area to throw them out at the next election.[15]

These excerpts from the House debate indicate that Congress intended § 2791(b) to make elected public officials responsible for community action agencies, and accountable to the electorate for agency activities. This purpose cannot be achieved unless the "public sector" directors are officials currently holding office, or their representatives. Only then will the officials be subject to public accountability through the electoral process.

Finally, it is appropriate in this case to accord considerable weight to an agency's interpretation of a statute it is responsible for administering.[16] CSA's position is set out in CSA Instruction 6400–01,[17] and in the papers filed with the Court in connection with this lawsuit. The agency's views are especially persuasive here since this is a dispute essentially between two local factions, and not a case where an agency is urging an interpretation that extends its own power.

For these reasons, the Court finds (1) that 42 U.S.C. § 2791(b) requires one-third of the membership of community action agency Boards of Directors to be elected officials currently holding public office, or their representatives; and (2) that as presently constituted, the CPI Board of Directors does not comply with 42 U.S.C. § 2791(b). The "Guida directors" are not elected officials; nor are they representatives of any elected officials currently holding public office. As long as they remain as directors, CPI's Board of Directors does not comply with 42 U.S.C. § 2791(b), and CPI is not eligible for federal funding. Whether state law permits CPI to make changes necessary to make the agency eligible for federal funds is not an issue in this suit.[18] Whatever state law restrictions may exist, it is clear that the "Guida directors," by promptly tendering their resignations, can enable CPI to receive federal funds. Defendants' motion for summary judgment is granted.

---

**15.** *Id.* at 35785 (remarks of Rep. Green.)

**16.** *Griggs v. Duke Power Co.,* 401 U.S. 424, 443–34, 91 S.Ct. 849, 28 L.Ed.2d 158 (1974); *Roe v. Norton,* 380 F.Supp. 726, 730 (D.C. Conn., 1974).

**17.** CSA Instruction 6400–01 is also labeled Memorandum No. 81. It is dated February 15, 1968, and is entitled "The Organization of Community Action Agency Boards and Committees under the 1967 Amendments to the Economic Opportunity Act." By itself, CSA Instruction 6400–01 does not consider the specific question presented in this case.

**18.** On June 22, 1976, Judge Frederick Mignone of the New Haven County Superior Court is-sued a permanent injunction restraining Mayor Logue and the "Logue directors" from interfering with the "Guida directors" in the "exercise of their rights, powers, and privileges as public sector representatives to the Board of Directors of Community Progress Inc." *Brewer v. Logue,* Docket No. 148724 (N.H.Cty.Sup.Ct., June 23, 1976).

Judge Mignone held only that the "Guida directors" had been appointed to the CPI Board according to state law and CPI's own by-laws. CPI's compliance with state law or its own by-laws, however, is irrelevant to the issue of its compliance with federal law for the purposes of meeting specific funding requirements.