William T. KELLEY, Charles P. Scott, Linwood Spruell, Fletcher Parker, Jr., Richard I. Johnson, Jr., George B. Gates, Linwood McGlone, Earnest Carlton, Plaintiffs,

v.

NORFOLK AND WESTERN RAILWAY COMPANY, Defendant.

Civ. A. No. 75–66–N.

United States District Court,
E. D. Virginia,
Norfolk Division.

March 7, 1977.

Alan P. Owens, Smith, Power & Owens, Norfolk, Va., for plaintiffs.

James T. Turner, Williams, Worrell, Kelly & Greer, Norfolk, Va., for defendant.

## MEMORANDUM ORDER

KELLAM, Chief Judge.

This action was instituted pursuant to 42 U.S.C. §§ 1981 and 2000e–5(f), and 28 U.S.C. §§ 1331, 1343(4), 2201 and 2202, alleging racial discrimination on the part of the defendant in its hiring, promotion and assignment of jobs. Plaintiffs seek injunctive and declaratory relief, monetary damages, job promotions with retroactive seniority rights and attorneys' fees.

In the final pre-trial order in this case, the parties stipulated the following:

## STIPULATION

All plaintiffs are black. Plaintiffs William T. Kelley, Charles B. Scott, Linwood Spruell, Fletcher Parker, Jr. and Linwood McGlone are employed by the Norfolk and Western Railway Company as Car Repairers at the 38th Street Car Repair Shop, Lamberts Point, Norfolk, Virginia. Plaintiff Earnest Carlton is employed by the defendant as a laborer at said facility. Plaintiffs Richard I. Johnson, Jr. and George B. Gates are former employees of the defendant at said facility, plaintiff Johnson having been dismissed on February 23, 1972, and plaintiff Gates having resigned on December 4, 1972. Plaintiff Johnson is a former Car Repairer and plaintiff Gates is a former Apprentice Car Repairer. Plaintiffs Kelley, Scott, Spruell, Parker, Johnson, Gates and McGlone applied for employment as Apprentice Car Repairers and were hired by the Norfolk and Western Railway Company as Apprentice Car Repairers upon their initial application for employment. The hiring dates of plaintiffs are as shown on copies of service records of plaintiffs which will be submitted as agreed exhibits.

All plaintiffs except Linwood McGlone and Earnest Carlton filed their charges of discrimination with the Equal Employment Opportunity Commission on March 1, 1972. Plaintiffs Linwood McGlone and Earnest Carlton have never filed any charge of discrimination with the Equal Employment Opportunity Commission.

Defendant Norfolk and Western is a corporation incorporated under the laws of the State of Virginia and is doing business within the Eastern District of Virginia. It employs more than fifteen (15) persons, and is engaged in a business affecting commerce, primarily engaged in the transportation of freight. Defendant is an employer within the meaning of 42 U.S.C. § 2000e(b).

I

In addition to the stipulated facts, the evidence establishes that prior to 1966 there is no record of any blacks applying for employment or being employed in the 38th Street Shop of the Railroad. Sometime about 1966 defendant commenced a vigorous apprenticeship program. Plaintiff Johnson made application and was accepted into the program, as did other plaintiffs. In 1968 the defendant commenced a policy of attempting to obtain at least one out of every three entrances into the apprenticeship program from a minority group, and to follow such a ratio in promotions.

No written standards are set forth for promotion to the position of supervisor. Car Repairmen are recommended by the supervisors for promotion to such positions. In making such recommendation they assert that consideration is and must be given to (a) determination, experience, knowledge and ability; (b) dependability—reporting to work regularly and on time; (c) ability to take orders, give orders, lead and instruct

others; (d) ability to understand the work; (e) performance; (f) prior record of the person with the Company, including record of any prior disciplinary action taken, considering the time when it occurred, nature, etc.; (g) length of employment with the Company; (h) self-motivation, desire for promotion, work habits, knowledge and performance under the rules, etc.

Not unlike other activities, some not promoted feel they were better qualified and entitled to promotion over those promoted. Complaints arose and this action followed.

## II

The 1964 Civil Rights Act enacted by Congress in 1964, in 42 U.S.C. § 2000e–2 provides, in part:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would tend to deprive an individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

\* \* \* \* \* \*

(h) Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment to a bona fide seniority or merit system . . . provided that such differences are not the result of an intention to discriminate because of race, color . . . . .

\* \* \* \* \* \*

(j) Nothing contained in this subchapter shall be interpreted to require any employer . . . to grant preferential treatment to any individual or to any group because of the race, color . . . on account of an imbalance which may exist with respect to the total number or percentage of persons of any race, color, employed by any employer . . . .

42 U.S.C. § 1981, provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

In a Title VII action a claimant "must carry the initial burden under the statute of establishing a prima facie case of racial discrimination." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), and the burden then shifts to an employer to articulate some legitimate nondiscriminatory reason for the employee's rejection. Continuing, the Court said that "Here petitioner has assigned respondent's participation in unlawful conduct against it as the cause for his rejection. We think that this suffices to discharge petitioner's burden of proof at this stage." [411 U.S. 803, 93 S.Ct. 1817, 1824]. The Court said it would not attempt to detail every matter which fairly could be recognized as a reasonable basis for refusal to hire. In dealing with the proof the Court of Appeals for the Fourth Circuit has said the courts must examine statistics, patterns, practices and general policies to ascertain whether discrimination exists. *Brown v. Gaston County, etc.*, 457 F.2d 1377 (4th Cir. 1972). However, it seems that statistical evidence is not sufficient as a matter of law to establish a violation of Title VII, particularly where it is shown a lack of qualified minority filed applications.

*Gilmore v. Kansas City Terminal Railway Company*, 509 F.2d 48 (8th Cir. 1975). But, in such event, the burden is on the employer to show that any given requirement must have a manifest relationship to the employment in question. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In the case at bar, the real question is the alleged discrimination in granting promotions. What is required by the Act, the Supreme Court said in the *Griggs case, supra,* is "the removal of artificial, arbitrary, and unnecessary barriers to employment [and promotion] when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." [401 U.S. 431, 91 S.Ct. 853]. Further, the Court in the *Griggs case* said at page 430–31, 91 S.Ct. at page 853:

Congress did not intend by Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed.

### III

We turn to the particular facts of the case and as they relate to plaintiffs. Mere assertions of discrimination do not prove discrimination any more than denials of it prove its absence. The evidence must be weighed in the light of all the circumstances. Conflicts in the testimony must be determined.

In general, the number of persons concerned are few. The classifications of employees which are the subject of this action are Janitors,[1] Laborers, Car Repairers [made up of Helper Car Repairers, Apprentice Car Repairers and Car Repairers] and Supervisors. In the unit there are two Blacksmiths, four Welders, one Derrick Man and one Chief Clerk. Records and rolls of the employees in such branches are

available for most years since 1966. It was at this time the apprenticeship was put in full swing for training of Car Repairers.

The makeup of the personnel of the first and second shifts of workers is determined by bid of the employee, based on seniority. Some have strong preferences for a particular shift because it permits them to have Saturday and Sunday off. The second shift of workers is made up of about one-half black and one-half white. Supervisors are named upon the recommendation of the Supervisors. In 1966 there were no blacks in the "Apprentice Car Repairers" program or the "Car Repairers," and only one in the "Helper Car Repairers." In 1967 the number of blacks in "Apprentice Car Repairers" jumped to 8, to 17 in 1968, 32 in 1969, 35 in 1970, 37 in 1971. While during those years there were slightly more whites, in 1970 the whites were 48 to 35 blacks, in 1971, 42 whites to 37 blacks, in 1973, 31 whites to 25 blacks, in 1974, 6 whites to 16 blacks. In 1966, in the Helper Car Repairer program there were 13 whites and 1 black. Not until 1972 was there a change when there were 9 whites and 9 blacks, in 1973, 7 whites and 8 blacks, 1974, 7 each. In Car Repairers there were no blacks in 1966. In 1971 there were 103 whites and 2 blacks, in 1972, 96 to 7, 1973, 96 to 10, and 1974, 93 to 20. Actually, to a great degree, the white Car Repairers in 1974 were those who had been there over many years. The material change came about with the entry of blacks into the Car Repairers Apprentice program and their advancement.

There is no contention that any qualified black was denied entry into the apprentice program. In fact, the evidence establishes that none applied prior to 1966. Beginning at that time, they were encouraged to do so, and many of them progressed well in the program. Some dropped out, or left for other employment and some were discharged.

The Car Repair Shop, to a great extent, has been career employment. Many of the men have been there over long periods.

---

1. There is only one person employed as a Janitor.

The sons of some of the men also work there. While plaintiffs assert this was discrimination, the sons of the blacks and whites both worked there.

Blacks likewise brought their sons to the Railroad. Gill, Valentine and Stonell, all blacks, have sons with the Railroad.

As will be seen, those in management employment have spent most of their working years with the Railroad.

J. S. Harrell has been with the Railroad since 1947. He started work as a Laborer. He was a Gang Foreman from 1966 to 1973. His son is employed as a Car Repairman, having come up through the apprentice system. He has been there 7 years and has not been promoted.

Jack E. Fiery started with the Railroad as a Laborer in 1942, made Carman in 1948, and Gang Leader in 1956. He is now Car Foreman in Cincinnati, Ohio.

Lance Seibert is Assistant Car Foreman. He has been with the Railroad since 1945, and been at 38th Street since 1962. He started as a Laborer, moved to Boilermaker. After going through the apprentice program, he did work as a Car Repairman. He became Gang Leader in 1953, and is now working for defendant in Ohio.

His son worked for the Railroad as a Helper. He did not have the opportunity to go through the apprentice program. The Railroad wanted to transfer him to another location, and rather than move, he resigned.

E. W. Proffitt, Assistant Car Foreman, came to Railroad in 1955 from another Railroad. J. R. Goodrich, Superintendent, started as a Laborer in 1941. At that time one-half of the Laborers were white. Kerren Stocks commenced work in 1957 as a Helper, and at that time worked with black Helpers. S. E. Six started with Virginian Railroad in West Virginia as a Carman apprentice. After a period of layoff, in 1963 he applied to Norfolk and Western, and entered as one of their original apprentices. Eugene Smelser started with the Railroad in 1938 as a Laborer Helper. Okie M. Thomas started with the Railroad in 1955 as a Helper apprentice, became Carman in 1957, and served as a Carman for 9 years. William G. Jackson began his service in 1947, became Car Repairman in 1950, and was made Gang Leader in 1960, and made Foreman in 1963 in Bristol.

### A

The employees reported each morning to their Foreman or Supervisor. They were then assigned their daily work and sent to the specific project, building or track. Complaint has been made by plaintiffs over a failure to assign them on a basis of seniority. However, it was quite apparent such could not be done. Permitting the men to bid on the work daily would require an unreasonable time. Too, with those who came in late, it would necessitate the rebidding of jobs to give them the right to bid the job they desired. If assigned on seniority from the list, it would bring about delays of refilling positions assigned from a list when some did not show up for that day.

The plaintiffs in general complained there was discrimination in the daily assignment of work. They said they were assigned to the unpleasant jobs, more difficult work, or shops they did not like to work in. But whites were assigned exactly the same way and all the said assignments were made regardless of race.

### B

Because of the extensive testimony of the plaintiffs, it is necessary to deal with it in some detail. Much of the problem arose with or around plaintiff Johnson.

Johnson entered the apprentice program in 1966, and completed his apprenticeship Car Repairman program in February 1970. After his first six months of employment he was upgraded to and given the pay of a Mechanic. He remained with the Railroad until his discharge February 23, 1972, for assaulting a Supervisor.

Johnson said he felt he was discriminated against; that he felt he was being watched by the Supervisors; that he felt he was required to do difficult jobs; that he was considered as having a negative or militant

attitude; and that he had daily arguments with his superiors.

Among his first complaints he said he was assigned a locker in the room with the Laborers while the Mechanics were on the other side of the room. However, it is clear from the evidence there were no lockers available on the side where the Mechanics' lockers were located. This problem was eliminated in 1967 when the wall or barrier separating the workers was removed. No such complaint has been registered since. Johnson described himself as a complainer and said he was in an argument almost daily.

(a) He complained that a white Mechanic had use of a power wrench while he used a manual one. But tools were assigned on a first come basis. A carman can obtain what tools he needs. They are assigned to him and he is supposed to keep them locked up. As to the large tools, the men on each shift use the same tools.

(b) He said he was required to brush up his work area, but each workman was required to do the same, black and white alike.

(c) Safety rules required the workmen to wear caps or hats. One of the purposes was to keep sparks from getting in the hair if they were burning with a torch. All now wear hard hats furnished by the Railroad. While he complained the whites were not required to do so, it is clear the rule was enforced against all alike. When he was told he must wear a cap or hat, he tied a white handkerchief around his head. When told this would not do, the next day he came with a woman's frilly hat. Asked to get a regular hat or cap, the next day he came with a very small hat pinned on with a hairpin. The next day he came with an Australian bush hat.

(d) While working with a Mr. Booth, he complained he was required to go in the pit,[2] and that Booth was not. Booth did the pit work 5 days a week and Johnson did it 2 days a week, but complained

because of this. Johnson said that Booth was old and suffering from arthritis, and the Supervisors were more lenient with him.

(e) He complained that some of the workmen were permitted to "coast." He said his Supervisors would try to give him the same opportunity to "coast," but he declined because he would not then be in a position to complain.

(f) He complained that Supervisors were granted special parking places, but he was not. However, the evidence established Supervisors needed quick access to their cars to answer emergency calls.

(g) He complained that if he parked in a place marked for no parking, or in a Supervisors parking area, he was called to move, but others were not. The evidence establishes the contrary. Numerous times he was called to move his car for blocking a fire lane, or blocking a Supervisor so that the Supervisor could not move his car.

(h) He said certain persons were told to harass him, but everyone questioned of this denied it, and there is no credible evidence to establish such a charge.

(i) He complained that each man working a train was required to put up a blue flag and to lock the switch to keep a train from coming in, and others were not required to do so. Such a complaint is without credible support. How could such a thing done for his safety be discrimination?

(j) He complained that on December 31, 1971, he asked off and he said he was told by his Supervisor he could mark off. He went to the office to mark off and was told no one would be permitted to take off. When he decided to mark off, he was again told that if he did so he would experience difficulty. He and Robertson marked off. The Supervisor stated he had not given authority for him to mark off.

(k) He complained he was required to attend showing of a safety movie on his

2. In checking car wheels, the car is rolled over it so that the inside of the wheel can be viewed.

own time while others could do so on Company time. It was clearly established all attended such a showing on their own time, except when there was a meeting of the Supervisors and Safety Committee, and the movie was then being shown, the showing was on Company time. Attendance of the Safety movie was encouraged, but it was on a voluntary basis.

(*l*) He asserted he was told by Jennings he was going to be made a Gang Leader, and by others they were recommending him for promotion to Foreman, but such statements were clearly established to be untrue.

(m) He complained of being investigated for failure to discover a "cracked wheel." While he says he was exonerated, it is clear he and a white person were reprimanded for this neglect.

(n) He complained that he was sent with Williams to put in two brake shoes and that Williams was called from the job to do some other task and he was left to do the job. Yet, he said one man could do the job.

(o) In February 1972, he was called over the public address system to come move his car as he was blocking another car, and to report to Mr. Harrell. He told Harrell he had left enough room for the other driver to get out, which proved to be untrue. In the discussion, Johnson said he told Harrell he was prejudiced. Harrell denied this and Johnson said he told him he was lying. While Johnson said Harrell used bad language toward him, the contrary is established by the evidence. As Harrell turned to walk away, Johnson came up behind him and struck him several times. Johnson testified he hit Harrell several times and kicked him, but Harrell did not hit him (Johnson). An investigation was conducted and as a result of this, Johnson was fired.

In spite of his conduct and actions, Johnson asserts he was discriminated against because he was not promoted and because of his discharge.

The record is abundantly clear that Johnson was habitually late in reporting in for work. One of the Supervisors discussed his attitude and work with him. He told him that to progress he must take an interest in his work, do a good job, improve his outlook, be prompt in reporting for work. On the very next day he was 30 minutes late coming in. He was uncooperative in his work, rebellious, argumentative, undependable, disruptive of the work, and constantly complained of his work assignments. He had a way of hiding from the work. When he was assigned a task, after completing it, he failed to return for assignment to another job. He refused to obey orders. He was described by his Supervisors as undependable. If he was assigned a task it required one to stick with him to be sure he did it. When safety meetings were held he either missed them or came in late, with his shoes untied, not fully dressed. He would drive up late, jump through the window, grab his clothing, and rush to the meeting.

While there is voluminous testimony concerning each plaintiff individually, we need not go into much detail with each of them.

Each plaintiff, in general, testified he felt he was discriminated against; that he was assigned the more difficult tasks; that he was passed over for promotions; and his failure to receive promotions was due to race discrimination.

Plaintiff Carlton complained he was not given the position of Apprentice Carman after working as a Laborer. When he came to the Railroad he applied for a position of Carman Apprentice. At that time there were no openings [3] in that program. At the time of trial he had been employed 17 months. But four blacks had been hired into the apprentice program during that

---

**3.** He is the only plaintiff not hired into the apprentice program. McGlone, a black, said he would not hire Carlton into the apprenticeship program because he could not get along with people. McGlone said whites were also hired into the labor force when there were no openings in the apprentice program.

period. Carlton's Supervisor said he was one of the worst Laborers ever hired; that he would not do his work and what he did do he botched up. Plaintiff Gates terminated his employment voluntarily before completing his apprentice program. He stated that his reason for termination was to accept other employment. McGlone's only complaint was a lack of promotion. He was selected as a temporary Gang Leader for several months. Scruggs served contemporaneously in the same capacity. When Gang Leader Stocks returned to work, there was no vacancy for McGlone, and he returned as Car Repairman. Scrugg's temporary Gang Leadership was made permanent because of the death of the former Gang Leader. The person supervising each said that McGlone was a good Gang Leader, but had the habit of collecting the men around him to talk with them, preventing them from doing their work. In fact, Joyner, a black Gang Leader said race had nothing to do with the selection of Scruggs over McGlone. Plaintiff Spruell felt he was discriminated against in the settlement of an injury claim which he filed against the Railroad. He was told he would be the subject of an investigation because of the number of accidents he had suffered. Spruell and plaintiff Kelley complained to EEOC of discrimination in promotion. But at that time neither was eligible for promotion. After Kelley became eligible for promotion he told Supervisor Garrett he did not want a promotion. While Parker complained of working a third shift, he said he bid that job under his seniority, because he wanted Saturdays and Sundays off. Too, Kelley testified he knew of no discrimination against himself or of blacks during his time of employment. He said of himself that he was frequently late for work and absent considerable time. In fact, the attendance record of the plaintiffs was not good. Many of them were habitually late, many had numerous AWOL's.

When promotions were discussed, each person, including plaintiffs, was told promotions were based on ability, performance, work record, attendance attitude and training. It is clear some of the plaintiffs were told to receive a promotion they would have to get their attendance up to par, stop coming in to work late. Some of them were told they were absent too much and there were too many AWOL's on their records. Spruell testified that when he asked what the problem was with him, he was told there was no problem, that he had to get himself together.

### C

Exhibit P/T 2 is a list of the Car Repairmen at the Lamberts Point Shop as of January 1, 1975, showing dates of employment. It clearly establishes that the number of whites promoted is very limited. Of the whites, 39 were employed between 1945 and 1955. Only 3 of this number were promoted; from 1956 through 1965, 33 were employed and 4 promoted; from 1966 through 1974, 53 were employed and 2 promoted. The first black to seek employment and entrance into the apprenticeship program was in 1966. No black had sought such employment before. Since then 25 blacks have qualified as Car Repairmen. The number of blacks and whites who have been accepted into the apprenticeship program is set out earlier and shows there was a steady percentage increase by year until 1973, when the blacks outnumbered the whites almost three to one, and the same is true of the Helper Car Repairers program. Too, blacks have been promoted to supervisory positions, and other blacks offered the promotion have declined. For instance, plaintiff Parker testified Hodges, a black, declined promotion, and Hodges testified he declined the offer on three occasions. McGlone said Gibson, a black, also declined the offer of promotion. Henry Webb, a black, testified he declined offer of promotion. Joyner,[4] Gillespie and Williams[5] were promoted to Foreman. When McGlone, a

---

**4. and 5.** Made Supervisor 5 days after completing his apprentice program. Not eligible until that program was completed, and Williams

came directly out of the apprenticeship program.

black, was promoted to temporary Gang Leader, he said there were a lot of whites with seniority over him who were not promoted.

It seems clear from the testimony of the white and black Supervisors that the requirements for promotion are pretty standard; that no recommendation for promotion was made based on race, but on merit. Many blacks, including plaintiffs, were not recommended for promotion because of their attendance records—late coming to work, AWOL—attitude, performance of work, lack of leadership, lack of incentive, lack of mechanical ability, and because they were not qualified for the position. It is clear race was not the factor. The Supervisors, white and black, testified as to the specific qualifications of each of the plaintiffs. The only one who met the qualifications and was in line for promotion was plaintiff McGlone. Without exception, they were of the opinion that the Supervisors had been selected on the basis of qualification, without regard to race. Williams and Joyner, black Gang Leaders, each testified there was no discrimination. Henry Webb, a black, testified there was no discrimination because of race. When asked of his former complaints, he said they were made when he considered only himself, and now when considering others, he knows there is no discrimination.

In reality, the plaintiffs' case resolves itself into complaints and not facts.

■ Selection of persons for promotion on the basis of performance, ability, work record and merit, so long as the selection of one over the other is not the result of an intention to discriminate because of race, is not prohibited or contrary to the Civil Rights Act. The evidence clearly establishes that the promotions and acts of hiring were within the required standards.

■ The plaintiffs have failed to establish they have been discriminated against because of race, nor is it shown there was discrimination by defendant in the operation of the facilities in question.

Relief is therefore DENIED and the complaint is DISMISSED.