Margaret TOWNSEND,
Plaintiff-Appellee,

v.

NASSAU COUNTY MEDICAL CENTER, Doctor Donald H. Eisenberg, Superintendent, Nassau County Civil Service Commission, Gabriel Kohn, Chairman, Edward S. Witanowski, Edward A. Simmons, Adele Leonard, Executive Director of Nassau County Civil Service Commission, New York State Department of Civil Service, Esra H. Posten, President of the New York State Civil Service Commission and head of the New York State Civil Service Department, Defendants-Appellants.

No. 827, Docket 76-7522.

United States Court of Appeals, Second Circuit.

Argued April 1, 1977.

Decided June 30, 1977.

Matthew A. Tedone, Deputy County Atty., Mineola, N. Y. (Natale C. Tedone, Senior Deputy County Atty., William S. Norden, Deputy County Atty., and William Gitelman, County Atty. of Nassau County, Mineola, N. Y., of counsel), for defendants-appellants.

Susan T. Kluewer, Community Legal Assistance Corp., Hempstead, N. Y. (McEvily & Kluewer, Community Legal Assistance Corp., Hempstead, N. Y., of counsel), for plaintiff-appellee.

Before LUMBARD, MANSFIELD and GURFEIN, Circuit Judges.

GURFEIN, Circuit Judge:

This individual Title VII action [1] is before us the second time.[2]

Appellee Margaret Townsend, a black female, began work on June 22, 1965 as a blood bank technician, at the Nassau County Medical Center, a county facility subject to the New York Civil Service Law. When Mrs. Townsend was appointed provisionally

1.   42 U.S.C. § 2000e *et seq.*

2.   On June 21, 1976, this court by order vacated a judgment for the plaintiff entered in the United States District Court for the Eastern District of New York after a trial before the Honorable Jack B. Weinstein. We remanded the case "for reconsideration in the light of *Washington v.* *Davis* [426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)], particularly Part III thereof." On remand, Judge Weinstein confirmed his original order and the judgment for the plaintiff described below. The defendants now seek review of both judgments.

as a "Senior Laboratory Technician," that position required graduation from high school, completion of an approved two-year course in medical technology, and two years experience as a technician in a medical laboratory or a satisfactory equivalent of a combination of training and experience. As a result of a survey conducted for the County by the firm of Cresap, McCormick and Paget, the County adopted a reclassification of all County positions subject to Civil Service effective July 7, 1967. Under the reclassification, Mrs. Townsend's job was designated "Medical Technologist I" and new prerequisites for appointment to a permanent position were established. It became necessary to pass a competitive examination which could be taken only by those holding either a bachelor of science degree or a certification by the American Society of Clinical Pathologists ("ASCP").[3] The County mitigated these new requirements, however, with a "grandfather clause" providing that an incumbent who had served at least one year prior to July 7, 1967, in a position whose prerequisites were affected by the reclassification adopted by the County Civil Service Commission, would be permitted once to take the examination for his new title, regardless of the announced training and experience requirements, "but that for ensuing examinations it would be necessary for him as well as all other candidates to meet the qualification requirements of the test announcements."[4]

Appellee Townsend was accordingly permitted to take the examination given in 1971, although she had neither a college degree nor ASCP certification. Unfortunately, she failed to pass the examination. Another person in the same blood bank, also without the requisite academic qualification, passed it. Mrs. Townsend was, nevertheless, permitted to continue as a Medical Technologist I in a provisional status because the list of eligibles resulting from the 1971 examination was insufficient to fill all positions.

A second examination for Medical Technologist I was administered in April, 1973. In accordance with the limited "grandfather clause," Mrs. Townsend's application to take the examination was rejected by the Nassau County Civil Service Commission, because she lacked the formal educational qualifications. As a result of the promulgation of a Medical Technologist I eligible list based upon the 1973 examination, Mrs. Townsend was discharged in December of 1973. Three white incumbents were similarly discharged. See note 8, infra. Three months later appellee was rehired by the blood bank and given the duties of a Medical Technologist I. However, she was placed in the lower paying classification of a Laboratory Technician II. In short, Mrs. Townsend was, as the litigants and the District Court recognized, in effect demoted to a lower paying classification because she lacks the formal academic prerequisites to take future examinations which were imposed some years after she began her employment, and because she failed the "grace" examination.

Mrs. Townsend then brought suit for reinstatement with back pay, alleging that the requirement of either a B.S. degree or ASCP certification violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. The essence of her Title VII theory is that the requirement of a B.S. degree or an ASCP certification has a disproportionate racial impact since far fewer blacks than whites in the general population have college degrees; and that the requirement violates Title VII because it is insufficiently job-related.

After a trial without a jury, the District Court held that appellee had established a prima facie case of discrimination and that appellants had not met their burden of justifying the academic prerequisites as job-related in their application to Mrs. Townsend. A distinction was perceived, however, between the rights of a person holding a job

---

3. One of the requirements for ASCP certification was a B.S. degree.

4. Specifically, incumbents would be permitted to take the first examination administered *after* the promulgation of the "grandfather clause" on December 9, 1968.

and a person seeking a job in the first instance. The District Court expressly disclaimed any intention to adjudicate generally whether these academic requirements were sufficiently job-related to be valid. Rather, it held that Title VII mandates that an employer must recognize the *actual* demonstrated job skills of a minority employee whether those skills are acquired through practical experience or through formal training. The court ruled that the educational requirements could not be applied so as to exclude a black employee "from a position for which she has demonstrated eminent qualifications."

In finding that the academic prerequisites were "inherently discriminatory"—*i. e.*, in finding a *prima facie* case of discrimination—Judge Weinstein recognized that the defendants had acted in good faith and with good intentions. Nevertheless, he observed that a job requirement violates Title VII if it has a racially disproportionate impact. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Noting that, in the general populations of Nassau County and New York State, proportionately far more whites have college degrees than do blacks—and especially female blacks—Judge Weinstein concluded that this statistical evidence of educational disparity was itself enough to establish the disproportionate racial impact of a degree requirement.

Having concluded that "a college degree requirement discriminates against blacks in New York State and Nassau County," Judge Weinstein next considered whether appellants had shown that this requirement was job-related. *See Griggs, supra* ; *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). He found no evidence indicating that persons with college degrees perform better as medical technologists than those who do not. The District Court concluded that since the plaintiff had demonstrated her actual job qualifications by on-the-job performance, a college degree could not be required as a prerequisite to employment *in her case*. The court limited its ruling on the validity of the degree requirement, however, to "the

special circumstances of the case before us." In short, the ruling of the District Court amounted to an *ad hoc* determination that Mrs. Townsend, by virtue of her demonstrable skill in the blood bank, was entitled to take another examination, and to retain her provisional status, without any time limitation, despite the existence of an unfilled eligible list.

The District Court, accordingly, ordered that: (1) plaintiff Townsend be reclassified as a provisional Medical Technologist I retroactive to December 31, 1973; (2) plaintiff be awarded back-pay for 1974 and 1975; and (3) plaintiff not be disqualified from taking future civil service examinations for permanent classification as Medical Technologist I by reason of her not having a college degree or certification by ASCP. The court made no provision for how long the plaintiff could remain in provisional status without passing an examination.

Mrs. Townsend can gain redress in the federal court only if she has suffered discrimination—either intentional or "objective"—because of her race or sex, or upon the ground that substantive due process protects incumbent job-holders from standards for permanent qualification created only after years of satisfactory service on the job.

We agree with the Nassau County defendants that appellee did not prove a *prima facie* case of racial discrimination against herself under Title VII and that she was not denied any "substantive due process" right.

As far as the *prima facie* case of discrimination is concerned, appellee adduced no evidence whatsoever of intentional discrimination, past or present, either by the County or by the Medical Center. It is well established, however, that a *prima facie* case may be made through evidence that an employment test or qualification has as a consequence "an exclusionary effect on minority applicants." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 n. 14, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *See Washington v. Davis*, 426 U.S. 229, 252, 96

S.Ct. 2040, 48 L.Ed.2d 597 (1976). Even as far as adverse racial impact is concerned, however, the only evidence offered by appellee were 1970 census statistics showing that in Nassau County college degrees are held by only 5.9% of blacks age 25 years or over, as opposed to 16.9% of whites, and by only 4.7% of black females, as opposed to 11.8% of white females.[5] There were no statistics for the B.S. degree in particular.

Neither *Griggs, supra,* nor *Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1361 (5th Cir. 1974), or *United States v. Georgia Power Co.,* 474 F.2d 906 (5th Cir. 1973), relied upon by appellee, support the proposition that statistical evidence concerning only the general population is sufficient to demonstrate that a job prerequisite "operates to exclude" minorities. In all of these cases plaintiffs established that virtually no blacks were *in fact* able to satisfy the challenged job qualification and obtain employment with the defendant.[6]

If we were to hold that a bare census statistic concerning the number of blacks in the *general population* who have college degrees could establish a *prima facie* case of discrimination, every employer with a college degree requirement would have the burden of justifying the degree requirement as job-related. *See Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The burden of showing job-relatedness cast upon the employer does not arise until the discriminatory *effect* has been shown. *General Electric Co. v. Gilbert,* 429 U.S. 125, at 137 n. 14, 97 S.Ct. 401, 408–09, 450 L.Ed.2d 343 (1976). "This burden arises, of course, only after the complaining party or class has made out a prima facie case of discrimination." *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280

(1975). We do not believe that a statistic relating only to the general population, and not to the employment practices of the particular defendant, should be sufficient to raise such a presumption against a college degree requirement. The requirement of a college degree, particularly in the sciences, seems to be in the modern day of advanced scientific method, a neutral requirement for the protection of the public. No doubt such a requirement could serve as a pretext for racial or sex discrimination, but this consequence should not be assumed. There will be time, if a showing of racial impact is made, for the comparison of the requirement of a degree in medicine, law, engineering or other professions with such a requirement for a laboratory technologist who is required by her Civil Service Title to be skillful in clinical chemistry, microbiology, blood-banking, serology, and hematology in more than one laboratory. The relative function of the academic prerequisites to job-relatedness varies inversely with the risk to the health and safety of the public who depend upon the technology. *See Spurlock v. United Airlines, Inc.,* 475 F.2d 216 (10th Cir. 1972) (college degree for flight officer held job-related); *Hodgson v. Greyhound Lines, Inc.,* 499 F.2d 859, 862 (7th Cir. 1974); 29 C.F.R. 1607.5(c)(2)(iii): ". . . a relatively low relationship may prove useful when the [economic and human] risks are relatively high." The issue will be whether a B.S. degree is substantially related to job performance. *Cf. Griggs, supra,* 401 U.S. at 431, 91 S.Ct. 849. But the fields of scientific knowledge are too disparate, and cover too many disciplines, for the mere existence of general college degree statistics in the general population, without more, to sustain a presumption of racial discrimination.

---

**5.** Similar statistics concerning the population of New York State as a whole were also submitted in evidence.

**6.** It is true that in *Griggs,* as well as *Georgia Power,* and *Goodyear Tire & Rubber Co.,* the courts noted that the educational requirements at issue were satisfied only by a disproportionately low number of blacks. *See* 401 U.S. at 430, n. 6, 91 S.Ct. 849; 491 F.2d at 1371; 474

F.2d at 918. But these statistics concerning the general population were relevant, not to establish the *prima facie* case of discrimination which had already been made, but to demonstrate that the racially disparate impact on defendant employer's workforce which was *otherwise* established, was *due to* the challenged job requirement, and not to some other practice of the employer or other cause.

In refusing to adjudicate whether the college degree requirement discriminated against blacks in general, including potential future applicants, the District Court itself recognized that the adoption of a college degree requirement cannot, merely because of the general racial composition of college graduates, be considered discriminatory. Judge Weinstein noted that "although no direct evidence was presented on this point, a degree or its equivalent might guarantee that new applicants possess the skills and learning needed for successful training in the blood bank. This question would have to be explored in any future litigation." [7]

It was precisely because the District Court was unwilling to hold that the requirement of a B.S. degree, neutral on its face, makes out a *per se* violation, that the District Court had to award relief to Mrs. Townsend on an *ad hoc* basis.

Unfortunately, we see no legal ground for such *ad hoc* relief. Surely, if we restrict our consideration to Mrs. Townsend individually, no inference of racial discrimination against her alone is possible, *cf. McDonnell Douglas v. Green, supra.* When the new job qualifications were promulgated she was "grandfathered" into one examination despite her acknowledged lack of the threshold prerequisite academic standing. Although she failed this examination, there is no claim—nor was evidence adduced— that the examination violated Title VII. Indeed, at least one incumbent afforded the opportunity to take the "grandfather" examination, passed it. And of the four incumbents who, like Mrs. Townsend, were demoted for failure to satisfy the new job requirements, three were white.[8] In short, the newly promulgated prerequisites, neutral on their face, were applied to each employee at the blood bank in a uniform and racially neutral manner.

Similarly, we see no basis for awarding *ad hoc* relief to Mrs. Townsend under a "substantive due process" theory. It might be argued that, wholly apart from racial implications, a state employee—even a provisional one—is entitled to some sort of due process protection against the subsequent promulgation of more stringent civil service requirements. A panel of the District of Columbia Circuit has held that, in the absence of a "grandfather clause," the promulgation of a degree requirement for licensure as a psychologist is an impermissible "irrebuttable presumption" that psychologists who have practiced for many years without benefit of academic degree are incompetent. *Berger v. Board of Psychologist Examiners,* 172 U.S.App.D.C. 396, 521 F.2d 1056 (1975). We need not consider, however, whether the status of a provisional Civil Service employee is distinguishable from that of an individual practitioner, in terms of an alleged "vested right" protected by due process. *Cf. Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Russell v. Hodges,* 470 F.2d 212 (2d Cir. 1972). Nor need we consider whether the heavily criticized "irrebuttable presumption" theory of due process retains its vitality. *See Weinberger v. Salfi,* 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975); Note, *The Irrebuttable Presumption Doctrine in the Supreme Court,* 87 Harv.L.Rev. 1534 (1974). For Mrs. Townsend was not confronted with any *irrebuttable* presumption of incompetence. Under the terms of the "grandfather clause" she had a chance to rebut any such presumption by passing the examination which she was permitted to take in spite of her lack of academic credentials. Thus the only issue that remains is whether it was reasonable for the County, in its "grandfather clause," to limit its waiver of the academic requirement only to the extent of permitting an incumbent—

---

7. The District Court credited the testimony of Mr. Applewhaite, the supervisor, "that a college degree might be useful."

8. These people, according to a sworn affidavit on the motion for a preliminary injunction of Ronald J. Levinson, Deputy Executive Director of the Nassau County Civil Service Commission, were Frederick Miller, Jean Wilson and Jean Bush, all white persons. The affidavit was not controverted on the motion.

white or black—to take one examination, rather than several. We cannot say that the choice made by the County to limit the waiver to one examination was irrational. *Cf. City of New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) ("grandfather clause" limited by number of years pushcart vendor is in operation).

There is no doubt that Mrs. Townsend presents an appealing case, not because she is female or black, but because she has done a satisfactory job for several years and is now required to perform essentially the same duties for less pay than is given to some of her own former trainees who have qualified for permanent civil service positions. We can understand the desire of the District Court to redress an "inequity" by using its power to effect such redress. The question is whether Title VII authorizes the exercise of such an ameliorative function by a District Court in this way. We feel constrained to say that, on these facts, were the District Court judgment to stand, this hard case would make bad law. Bare figures on college degree distribution in the general population do not, in themselves, prove discrimination based on race, sex, or ethnic or national origin, in fields of scientific training in which risks to human life are involved. The black community has already made tremendous strides in achieving academic degrees, and, happily, there appears to be continuing, steady progress. In any event, should a college degree requirement ever be interposed as a prerequisite simply as a pretext for disqualifying members of the black community, the courts will be alert to deal with violations of Title VII. But we cannot say that this is such a case.

Reversed with directions to dismiss the complaint.