JOYCE R. COUNTISS, COMPLAINANT-RESPONDENT, v. TRENTON STATE COLLEGE, DR. KENNETH TILLMAN AND DR. KENNETH C. RUNQUIST, RESPONDENTS-APPELLANTS.

Argued April 25, 1978—Decided October 12, 1978.

*Ms. Sherrie L. Gibble,* Deputy Attorney General, argued the cause for appellants (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Mrs. Erminie L. Conley,* Deputy Attorney General, of counsel).

*Mr. Robert S. Raymar* argued the cause for respondent (*Messrs. Hellring, Lindeman, Landau and Siegal,* attorneys).

The opinion of the court was delivered by

CONFORD, P. J. A. D. (temporarily assigned). Trenton State College ("College") appeals, on grant of certification, 75 *N. J.* 529 (1977), from a judgment of the Appellate Division affirming a decision of the Division on Civil Rights finding the College guilty of sex discrimination in having denied a tenure-reappointment to Joyce R. Countiss, an instructor in physical education. The decision granted Countiss damages for lost earnings and ordered her to be restored to the faculty at the College with tenure. At the end of her second year as an instructor (June 1972) Countiss had been informed by the administration that she would not be granted tenure at the conclusion of her third year because of lack of a "terminal [doctorate] degree or any extraordinary compensatory qualities."

The rationale of Countiss's purported case of sex discrimination is based upon the following assertions of fact. She was engaged in 1970, and, in addition to some teaching, she was designated coach of the women's basketball and softball teams at the College. Coaches of team sports were accorded "released time" from a uniform teaching load of 12 credits a semester for their coaching duties. By virtue of administrative policy all men's teams were coached by men and women's teams by women. During the time-frame here pertinent, 1970–1971 and 1971–1972, women coaches re-

ceived release time credit for coaching on a quarterly basis and men on a semester basis. The women coaches complained about this as discriminatory, and the system was made uniform (on a semester basis) after Countiss was terminated. The practical operation of the system insofar as coaches of men's and women's basketball teams was concerned was that the men received five credits a semester (during the entire semester) for basketball even though the coaching duties did not occupy the whole of either the fall or the spring semester. The women (Countiss) received four credits, but only during the second and third quarters of the school year, this on the supposed basis that women's basketball coaching duties required time only during those quarters. Thus, on an averaged annual basis, the men were receiving released time credit of ten hours and women only four hours.[1] Claiming that the overall expenditure of time in coaching and incidental duties (recruiting, scouting, etc.) did not vary substantially as between men and women coaches, Countiss asserts that allowing the men's basketball coaches ten credits of released time a year and her only four such credits was discriminatory. From that position, the asserted thesis is that the time left to pursue graduate work was insufficient to enable Countiss to make the "significant progress" toward the doctorate by the end of her second teaching year which the administration indicated would have been required to qualify her for tenure.

Countiss made alternative contentions of sex discrimination. One was that on a national basis only one-third of all holders of doctorates in health and physical education were women; the other, that in the college's department there were in 1972 thirteen male coaches, of whom eleven were tenured and seven female coaches, of whom four were tenured. None of the tenured coaches had doctorates. We dismiss both of these allegations of sex discrimination sum-

[1]The effect on comparative teaching loads was an average for the year of ten hours for Countiss and seven for the men coaches.

marily as without even *prima facie* merit. *Cf. Pace College v. Com'n Hum. Rts., etc.*, 38 *N. Y.* 2d 28, 377 *N. Y. S.* 2d 471, 478, 339 *N. E.* 2d 880, 884 (Ct. App. 1975) ; *Townsend v. Nassau County Medical Center*, 558 *F.* 2d 117, 120 (2 Cir. 1977), *cert.* den. 434 *U. S.* 1015, 98 *S. Ct.* 732, 54 *L. Ed.* 2d 759 (1978). We need only note, in connection with the latter contention, that the administrative policy for requiring doctorates or substantial progress thereto began to develop only in 1970. Further, the fact that four women coaches were previously tenured without doctorates tends to show the College had no prior sex bias in awarding tenure.

## I

The College's defense at the hearing in the Division of the differences in allocating release time as between men and women coaches was that men coaches had more time-consumming responsibilities in scouting other teams and in recruiting student-athletes than the women coaches and that the men's sports seasons were longer. However, no evidence was offered in these regards except for basketball coaches and seasons. Moreover, it was established that the men's season was only two weeks longer than the women's and that Countiss was required to coach both the women's junior varsity and the varsity basketball teams in her second year and attend all their games while the men coaches had assistant coaches for the men's junior varsity team. Although the men's team played more regular season games, the women's played post-season championship games which required Countiss's attendance.

The College offered in evidence responses to questionnaires submitted by men and women basketball coaches as to the amount of time actually entailed by coaching duties. Countiss's response was 421 hours while each of the two men coaches returned figures in excess of 1200 hours. These responses covered only a single year and were obtained for purposes of meeting a·U. S. Labor Department investigation

prompted by Countiss's complaint concerning the disparate release time system. There was only generalized corroboration of these unsworn figures; they could easily have been exaggerated, and the hearing officer was warranted in giving them limited weight.

Among other findings of fact by the hearing officer in the Division was one that "discrimination was * * * perpetrated * * * in creating adverse work schedules for women." In similar vein, the Director of the Division found that Countiss was discriminated against in respect of the heavier work load under the policy on release time. We agree with the Appellate Division that consideration of the record as a whole justifies the conclusion that there was sufficient credible evidence to sustain the finding of the Division that Countiss was discriminated against in respect of work load because of the disparate rules as to release time for men and women coaches. *Jackson v. Concord Co.*, 54 *N. J.* 113, 117–118 (1969). Although there was no finding of discriminatory intent on the part of the college, and the differences in release time were purported to be related to the sex of the teams rather than of the coaches, the fact remains that all coaches were of the same sex as the athletes coached and that all women coaches were subjected to the discriminatory quarterly system of release time as compared with the more favorable semester system for the men. The degree of disparate treatment was not shown to be justified by any educational ("business") considerations, and the "impact" of the disparate treatment is such as to categorize the resulting discrimination as based on sex regardless of absence of invidious intent. See *Int'l Brotherhood of Teamsters v. United States*, 431 *U. S.* 324, 335, n. 15, 97 *S. Ct.* 1843, 52 *L. Ed.* 2d 396 (1977); *Peper v. Princeton University*, 77 *N. J.* 55 (1978).

## II

Notwithstanding our holding in I, above, we are unable to agree with the consequential decision of the

Division, affirmed by the Appellate Division, that the College be ordered to reinstate Countiss with tenure.

Preliminarily, there has been no evidence in this case, nor any finding, that the responsible authorities had not in good faith arrived at the conclusion by the spring of 1972 that either a doctorate or significant progress thereto was an important factor for consideration in passing upon an award of tenure to any instructor in the health and physical education department of the College as to whom the doctorate would be the terminal degree.[2] There is uncontroverted evidence in the record that this policy was applied without any discrimination as to sex in and after 1972. The fact that a formal declaration of that policy was not published until 1973 is immaterial. So is the fact that Countiss was not expressly notified of the policy when engaged. The evidence is clear that the policy was publicized during her tenure and she could properly be expected to have put herself on inquiry of it. In sum, it is indisputable that the denial of tenure to Countiss was on the merits of her application and not based on her sex.

Consequently, we are confronted with the unassailable fact that when the decision as to tenure for Countiss was made in June 1972 she was not in compliance with a major requisite for tenure, absent other extraordinary professional qualities or activities which she was deemed by the Administration not to possess. The Division of Civil Rights found that the discriminatory policy as to release time had "made it more difficult for the Complainant to meet 'the significant progress toward a doctorate' standard" of the College than it would have been for male coaches. We regard this as an immaterial finding in relation to the propriety of an award by the Division of a tenure reinstatement.

Two considerations are very significant in this regard: (1) the declaration of entitlement to tenure is a highly discre-

---

[2]Countiss was in this category. She had a master's degree.

tionary determination vested in the boards of trustees of the educational institutions involved. *N. J. S. A.* 18A:60–1; 18A:64–6; 18A:64–7; *Assoc. of N. J. State Col. Fac. v. Dungan,* 64 *N. J.* 338, 355 (1974) ; and (2) no substantial causal relation was established by Countiss between her teaching and coaching load and her failure to have achieved significant progress toward a doctorate by the end of her second teaching year.

Dealing with the first of the foregoing considerations, and in particular with the statutory authority of the Director of the Division in an appropriate case to take affirmative action in an employment discrimination situation, such as "reinstatement or upgrading of employees, with or without back pay * * *," see *N. J. S. A.* 10:5–17, it is obvious that different considerations would apply in relation to a college instructor denied tenure from those pertinent as to one discharged from an ordinary job in private employment. Reinstating the latter would offend no counter consideration in the public interest. But granting tenure to a college teacher found not qualified therefor by the responsible administrative authorities is plainly contrary to sound educational administration. See *Donaldson v. Bd. of Ed. of No. Wildwood,* 65 *N. J.* 236, 241 (1974) ; *Zimmerman v. Board of Education of Newark,* 38 *N. J.* 65, 73 (1962), *cert.* den. 371 *U. S.* 956, 83 *S. Ct.* 508, 9 *L. Ed.* 2d 502 (1963). In a closely comparable case Chief Judge Breitel, speaking for the New York Court of Appeals, had the following observations:

Neither the commission nor the courts should invade, and only rarely assume academic oversight, except with the greatest caution and restraint, in such sensitive areas as faculty appointment. promotion and tenure, especially in institutions of higher learning (cf. *New York Inst. of Technology v. State Div. of Human Rights,* 48 *A. D.* 2d 132, 368 *N. Y. S.* 2d 207, mot. for lv. to app. granted 37 *N. Y.* 2d 709. 375 *N. Y. S.* 2d 1028, 338 *N. E.* 2d 330 ; *Faro v. New York Univ.,* 2 *Cir.,* 502 *F.* 2d 1229, 1231–1232). Schools of higher learning are not "businesses" where employees are all fairly fungible unskilled or semiskilled workers (see, e. g., *State Div. of Human Rights v. Kilian Mfg. Corp.,* 35 *N. Y.* 2d 201, 209, 360 *N. Y. S.* 2d 603, 608, 318 *N. E.* 2d 770, 773, *supra*). In a professional or aca-

demic milieu subjective judgments necessarily have a proper and legitimate role * * *.

*Pace College v. Com'n on Hum. Rts., etc., supra,* 377 *N. Y. S.* 2d at 478–479, 339 *N. E.* 2d at 885.

It is not necessary for us here to decide that reinstatement with tenure could never constitute an appropriate remedy in a college discrimination case. We may leave for determination in a pertinent case a situation, for example, of direct denial of a tenure appointment to an apparently qualified applicant because of race, sex, etc. *Cf. Endress v. Brookdale Community College,* 144 *N. J. Super.* 109, 118, 129–131 (App. Div. 1976) ; *Johnson v. University of Pittsburgh,* 435 *F. Supp.* 1328, 1353, 1371 (W. D. Pa. 1977) ; *Keddie v. Pennsylvania State University,* 412 *F. Supp.* 1264, 1270 (M. D. Pa. 1976) ; *Francis v. Ota,* 356 *F. Supp.* 1029, 1033 (D. Haw. 1973).

In the present case the tenuousness of the asserted connection between the claim of inability to qualify for tenure and the discrimination visited upon Countiss in respect of work load, taken together with the proven solid foundation for the College's requirement of significant progress toward a doctorate for tenure seekers and Countiss's lack thereof, strongly spell out a clearly mistaken exercise of judgment by the Division in awarding Countiss a tenure reinstatement.

It is notable that, taken in absolute terms (rather than by comparison with the favorable treatment of men coaching faculty), the teaching and coaching load imposed on Countiss, equating to 12 class hours or the equivalent, has not been attacked as excessive — certainly not as rendering it impossible for her to have taken graduate courses. The burden of working toward a graduate degree while teaching is a heavy one for all aspirants to tenure, not peculiar to the case of this complainant. Countiss did manage to take six hours of graduate classes during one semester, after notification of denial of tenure, despite carrying the same teaching and coaching load as before. Although she could have achieved six credits in each of the pre-summer sessions of

1971 and 1972, she earned only three credits in 1972 and none in 1971. Of substantial significance is her attribution of these deficiencies to lack of finances, rather than lack of time. She also failed to take courses in the summer of 1971 and in the fall of 1970 and 1971, at each of which times up to six credits could have been earned.

We conclude there was no substantial factual basis in the credible proofs for the findings in the Division that Countiss's teaching and coaching load (conceding discriminatorily favorable treatment of men coaches) was a substantial factor in her failure to achieve the graduate work which would have enabled her to qualify for tenure.

In the stated circumstances, and for the reasons set forth hereinabove, it was a plainly mistaken exercise of discretion for the Division to have directed reinstatement of Countiss with tenure (assuming the power so to act existed at all). By the same token, the award of damages for the differential in earnings between salary as a tenured instructor and other earnings must be vacated.[3]

Judgment reversed; no costs.

PASHMAN, J., concurring in part and dissenting in part. The result announced herein is incomplete inasmuch as it does not make Countiss whole by providing that she be reimbursed for the heavier teaching/coaching load, as compared to male coaches, which she shouldered for three years. In addition, the majority fails to address a troublesome issue in this case — the propriety of the hearing examiner's finding that a doctorate was not the terminal degree in physical education, notwithstanding the *bona fide* belief of educators at Trenton State University that it was the terminal degree. Finally, I cannot accept the majority's implication that the

---

[3] We do not remand for an award of "back pay" to compensate for the differential in teaching load, as advocated by the dissent. Such a claim has never been asserted by Countiss in this litigation, and we do not regard such action on the Court's own motion as warranted upon consideration of the case as a whole.

Division on Civil Rights may lack the power to order reinstatement with tenure. Such a suggestion contravenes *N. J. S. A.* 10:5–17, which explicitly grants the Division authority to order any person who has violated the provisions of the Act to "take such affirmative action * * * as * * * will effectuate the purpose of this act * * *."

## I

The hearing examiner found that Countiss had been the victim of discrimination in the scheduling of her work:

* * * [T]he work schedule for coaches was such that it discriminated against women and imposed greater burdens upon them which made it difficult for the complainant to arrange doctoral study time.

The Director of the Division on Civil Rights adopted the above finding and went on to find that,

* * * Respondents discriminated against the Complainant by imposing a heavier work load on her than on male teacher-coaches under the policy on release time for coaching discussed by the Hearing Examiner.

Averaged out over the year, the men's varsity basketball coaches had to teach only seven hours of classes a week, while the women's varsity basketball coach, Countiss, had to teach ten hours of classes.[1] She received credit for four hours

---

[1]The following chart shows the hours of teaching required per week at various times in the year, based on the fact that these persons coached varsity basketball.

| | First Semester | | Second Semester | |
| --- | --- | --- | --- | --- |
| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
| Women's varsity coach (Countiss) | 12 | 8 | 8 | 12 |
| Men's varsity coaches | 7 | 7 | 7 | 7 |

By adding these figures and dividing by four, the average number of hours per week taught comes out to ten for Countiss and seven for the men's coaches.

of teaching, out of a required twelve hour per week load, during the second and third quarters of the school year when women's basketball was in season. The men's varsity basketball coaches received five hours of credit over the entire year, even though their season was at most two weeks longer than the women's season. I concur in the holding of the Court that this disparity in work load discriminated against Countiss on the basis of sex, see *ante* at 594–595 and would uphold that finding of the Division on Civil Rights as affirmed by the Appellate Division.

However, the majority does not address the consequences of this act of discrimination against Countiss. Since we have found that Countiss, in effect, was forced to work longer hours than male coaches because of unlawful sex discrimination, justice requires that she be made whole for her extra work. On the present record, it would be improper for this Court to fix an amount which would reimburse Countiss for her work above and beyond that normally required in a twelve-hour teaching week. I would therefore remand this case to the Division on Civil Rights to determine the amount of back pay owed Countiss for the heavier teaching responsibilities imposed upon her.[2] Such a remedy is expressly authorized by *N. J. S. A.* 10:5–17 which mandates that the Director order a violator of the Law Against Discrimination to take such affirmative action, "including, but not limited to, hiring, reinstatement or upgrading of employees, *with* or without *back pay* * * * as * * * will effectuate the purpose of this act * * *" (emphasis added). Since *N. J. S. A.* 10:5–4 makes freedom from sex discrimination a civil right, back pay to make the victim of such discrimination whole is surely consistent with the Act's purpose.

---

[2] Any and all remedies for back pay through the Commissioner of Education remain available to Countiss.

## II

A troubling aspect of this case, which was not fully addressed by the majority, is the hearing examiner's conclusion that "* * * the respondents did not establish clearly that the terminal degree for coaches is a doctorate." This finding was not relied upon by the Director of the Division on Civil Rights, as he held that even assuming the validity of such a requirement, discrimination in release time prevented Countiss from acquiring a significant number of credits toward the doctorate. However, I believe that the hearing examiner acted improperly, given the record before him, in not adopting the criteria for tenure set by Trenton State College. As the majority points out in a different context, the considerations which apply with respect to qualifications for employment or promotion in private employment and those applicable to a college instructor are not the same. See *ante* at 596–598.

The highly regulated sphere of public education is not analogous to a private factory with various production units. Tenure requirements are more subjective because the needs of a particular department in a particular school are generally unique. Moreover, the commitment of employment made to a tenured faculty member is without counterpart in the private sector. Thus, I can only conclude that the hearing examiner erred in applying the strict business necessity test of *Griggs v. Duke Power Co.,* 401 *U. S.* 424, 431–432, 91 *S. Ct.* 849, 28 *L. Ed.* 2d 158 (1971), when judging the propriety of Trenton State's selection of the doctorate as the terminal degree for members of the Department of Health and Physical Education.

It was well known that for several years the Chancellor of the New Jersey Department of Higher Education had been urging state colleges to require doctorates of those to whom they granted tenure. Moreover, in the fall of 1971 the National Association of State Directors of Teacher Education Certification's team of evaluators found a serious need

for additional faculty members with doctorates in the Department of Health and Physical Education. With respect to that department's masters degree program, the need for more faculty with doctorates was deemed critical. In light of these factors, the hearing examiner abused his discretion in refusing to credit Trenton State's determination that a doctorate was the proper terminal degree for members of the Department of Health and Physical Education.

The Division on Civil Rights is not competent to select or reject tenure criteria for colleges. That is a matter for the expertise of educators. Since the selection of a doctorate as the terminal degree in Countiss' department was not shown to be bottomed on an improper discriminatory motive, the Division on Civil Rights could concern itself only with assuring non-discriminatory implementation of that valid criterion for tenure. While I sympathize with Countiss' frustration in not receiving tenure despite her demonstrated ability to teach and coach, it would be equally as improper for a court to determine the proper criteria for tenure as it would be for the Division on Civil Rights.

### III

Lastly, I am troubled by the *dicta* in the majority opinion which implies that the Division on Civil Rights may not order reinstatement with tenure to remedy a college's act of discrimination. See *ante* at 596–598. While such a remedy must be granted sparingly, and only where it will not harm the educational institution, it is plainly contemplated by the Law Against Discrimination. The following provisions of that Act make manifest the legislative intent:

The Legislature finds and declares that practices of discrimination against any of its inhabitants, because of race, creed, color, national origin, ancestry, age, sex, marital status, liability for service in the Armed Forces of the United States, or nationality, are a matter of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants

of the State but menaces the institutions and foundation of a free democratic State; * * *

[*N. J. S. A.* 10 :5-3]

There is created in the Department of Law and Public Safety a division known as "The Division on Civil Rights" with power to prevent and eliminate discrimination in the manner prohibited by this act against persons because of race, creed, color, national origin, ancestry, age, marital status or sex * * *

[*N. J. S. A.* 10 :5-6]

Where discrimination is found, the Legislature intended that the Division on Civil Rights have broad remedial powers:

If, upon all evidence at the hearing the director shall find that the respondent has engaged in any unlawful employment practice or unlawful discrimination as defined in this act, the director shall state his findings of fact and conclusions of law and shall issue and cause to be served on such respondent an order requiring such respondent to cease and desist from such unlawful employment practice or unlawful discrimination and *to take such affirmative action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, or restoration to membership, in any respondent labor organization, or extending full and equal accommodations, advantages, facilities, and privileges to all persons, as, in the judgment of the director, will effectuate the purpose of this act,* and including a requirement for report of the manner of compliance. * * * The director shall have the power to use reasonably certain bases, including but not limited to list, catalogue or market prices or values, or contract or advertised terms and conditions, in order to determine particulars or performance in giving appropriate remedy.

[*N. J. S. A.* 10 :5-17
(emphasis added)]

In *Jackson v. Concord Co.,* 54 *N. J.* 113 (1969), this Court commented on the legislative policy expressed in *N. J. S. A.* 10 :5-17.

* * * it is patently clear that the Legislature intended to create an effective enforcement agency in order to eradicate the cancer of discrimination.

[54 *N. J.* at 124]

Although reinstatement has been a common remedy in situations where an already tenured faculty member is wrongfully discharged, *see Endress v. Brookdale Community College,* 144 *N. J. Super.* 109 (App. Div. 1976); *Viemeister v. Prospect Park Boro Bd. of Ed.,* 5 *N. J. Super.* 215 (App. Div. 1949); *American Ass'n of Univ. Professors v. Bloomfield College,* 129 *N. J. Super.* 249 (Ch. Div. 1974), aff'd 136 *N. J. Super.* 442 (App. Div. 1975); *Walker v. Wildwood Bd. of Ed.,* 120 *N. J. L.* 408 (Sup. Ct. 1938), the remedy of requiring a college to grant tenure to a faculty member is relatively novel. However, in *Flanders v. William Paterson College,* 163 *N. J. Super.* 225 (App. Div. 1976), the Division on Civil Rights made such an order. Where the Division properly found that age was "at very least a conscious factor" in the decision to deny retention and tenure to Dr. Flanders, its order that he be offered reinstatement with its accompanying tenure plus back pay was upheld.

I would have difficulty with any expansive use of the Division's power to grant reinstatement with tenure. However, this does not mean that the Division on Civil Rights may never order a college to grant tenure to a faculty member. Given the wording of *N. J. S. A.* 10:5–17, such a holding would seem to fly in the face of the express intent of the Legislature that victims of employment discrimination be made whole. In the instant case, for example, the record indicates that Countiss was a respected member of the faculty. Thus, if the Court were convinced that sex discrimination was indeed the cause of her denial of tenure, affirmance of the order below that Countiss be accorded tenure would be proper. Were we to conclude that the doctorate requirement was discriminatorily motivated, or that male teacher-coaches were not required to have doctorates, there would be no reasonable alternative to that of granting Countiss tenure. Surely we would be duty bound to make her whole by ordering her reinstatement with tenure. Of course, where a given instructor clearly lacks

an important qualification for tenure, a remedy other than ordering tenure must suffice, notwithstanding the fact that the plaintiff was the victim of discrimination.

In sum, I concur in the holding that the discrimination suffered by Countiss was not the cause of her failure to achieve tenure. I also concur in the vacating of the earnings differential reflective of what Countiss would have earned had she been a tenured faculty member from 1973, which had been awarded to her by the Division on Civil Rights. However, I dissent from the Court's failure to require that Countiss receive back pay reflecting her heavier work load than comparable men's team coaches.

In my view, the Court should use the full panoply of remedies at its disposal to guarantee that victims of illegal discrimination, like Countiss, are made whole. Only then will such wrongful conduct cease.

*For reversal*—Chief Justice HUGHES, Justices SULLIVAN, CLIFFORD, SCHREIBER and HANDLER and Judge CONFORD —6.

*For remandment*—Justice PASHMAN—1.